**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 18-271** |
| | : | |
| **JAMES FRANKLIN HILL** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                                                    **July 31, 2020**

After thirty-nine convictions for a variety of crimes, James Franklin Hill turned to the internet and began bait and switch gold coin schemes victimizing seventeen persons in eleven states who suffered a combined loss of $330,230. Arrested March 15, 2017 after over seven years of these scams, he eventually admitted his crimes and we accepted his plea. We sentenced Mr. Hill sixteen months ago to sixty-five months imprisonment with credit for time served since arrest, followed by three years of supervised release. The Bureau of Prisons is presently supervising Mr. Hill at FCI-Allenwood. He now moves for compassionate release citing his obesity and heart concerns pose a risk of contracting COVID-19 in prison. He claims rehabilitation and immediate release will serve Congress's sentencing policy. The United States concedes Mr. Hill's medical condition qualifies as an extraordinary and compelling reason for a sentence reduction to time served; it opposes his release because he is dangerous to the community and release would be contrary to sentencing policy. We agree with the United States. Mr. Hill has led a life of serial crime. In his forties and fifties, he victimized persons through bait and switch schemes in several states through technology and personal meetings. After careful evaluation and while commending him on his represented rehabilitation consistent with our sentence, we must find he poses a danger to our community and release does not comport with Congress's sentencing factors.

**I.      Facts**[1]

James Franklin Hill is a fifty-seven-year old man raised in a household marred by poverty, substance abuse, physical abuse, and food and utility instability.[2] At fourteen, the State of New Jersey placed Mr. Hill on one year of juvenile probation for charges involving assault and battery, robbery, and possession of stolen property.[3] Mr. Hill's adult criminal history, beginning at the age of eighteen, includes at least thirty-nine convictions in five states for drug offenses (possession and distribution), fraud, receiving stolen property, simple assault, aggravated assault of a police officer, assault and kidnapping, robbery, larceny, possession of a weapon, shoplifting, theft, forgery, obstruction of justice, and absconding from parole.[4] Mr. Hill spent nearly a decade in a New Jersey state prison from 1991 to 2001.[5]

Mr. Hill suffers from a gambling addiction and a drug and alcohol addiction beginning at age fourteen or fifteen with marijuana and progressing into cocaine, heroin, and oxycodone.[6] Mr. Hill completed a drug treatment program while in state prison between 1999 and 2001 as well as group therapy, and participated in a reentry inpatient drug program followed by outpatient treatment from 2013 to 2014. Mr. Hill is obese with a history of high cholesterol, high blood pressure, and atherosclerosis (coronary artery disease) requiring stent placement in 2013.[7] Mr. Hill is prescribed aspirin, a statin for high cholesterol, and medication for high blood pressure.[8]

*Mr. Hill's most recent conviction.*

As Mr. Hill has admitted, the case before us is just one of several victims of scams beginning in 2010.[9] In November 2016, a coin dealer and collector who advertised his interest in purchasing gold coins on Craigslist, received a text from Mr. Hill inquiring how much the collector would pay for a set of twenty-four Canadian Gold Maple Leaf coins.[10] At an arranged meeting, Mr. Hill allowed the collector to inspect the gold coins to confirm their authenticity.[11] Once the

2

collector determined the coins were pure gold, he agreed to pay Mr. Hill $19,000 in cash for the set and, as the collector counted out the cash, Mr. Hill took the coin set and placed it in his sweatshirt claiming he needed more time and more money.[12] When the collector agreed to pay an additional $1,400, Mr. Hill then handed a coin set to the collector, switching the authentic coin set with a fake set.[13] The collector did not discover his duplicity until later.[14]

Authorities ultimately learned Mr. Hill conducted similar "bait-and-switch" schemes for over seven years defrauding seventeen victims in eleven states of a combined loss of $330,230.[15] Mr. Hill pleaded guilty to one count of wire fraud for selling counterfeit Canadian Gold Maple Leaf coins.[16] He agreed we could consider his other scams as relevant conduct.

Mr. Hill, represented by the Federal Defenders, entered into a plea agreement with the United States agreeing to plead guilty to one count of wire fraud arising from the bait-and-switch sale of the twenty-four Canadian Gold Maple Leaf coins and accepted responsibility for the same conduct with regard to his victims in other states between 2010 and 2017.[17]

On April 1, 2019, we sentenced Mr. Hill to sixty-five months imprisonment with credit for time served since his March 15, 2017 arrest, followed by three years of supervised release.[18] Mr. Hill's current maximum sentence release date is October 27, 2021. He is currently incarcerated at the medium security Federal Correctional Institute in Allenwood, Pennsylvania ("FCI-Allenwood").[19]

### *Mr. Hill's present health condition and disciplinary history in prison.*

On April 27, 2020, Mr. Hill went to prison health services complaining of chest pain radiating to the left shoulder and shortness of breath with exertion.[20] The examining provider noted Mr. Hill's history of coronary artery disease and Mr. Hill did not take his medicine that day, noting a history of noncompliance with his medications.[21] The medical records of Mr. Hill's April 27,

2020 examination show a normal blood pressure, pulmonary, and cardiovascular exam, including an electrocardiogram.[22] The provider requested a consultation with a cardiologist for a chemical stress test.  A June 22, 2020 stress test revealed normal results.[23]

The United States contends Mr. Hill committed two disciplinary infractions while in prison: use of drugs/alcohol on February 3, 2019, and possession of an unauthorized item on August 7, 2019.[24]

If released, Mr. Hill plans to reside with his wife and their two children.[25] He reports having two job offers: a car salesman and manager of a dry-cleaning business.[26]  He will "reinstate" his health insurance and contact his cardiologist for an appointment.[27]

**II.     Analysis**

Mr. Hill requests compassionate release arguing his health condition places him at high risk for catastrophic health consequences or death from COVID-19 while in custody at FCI-Allenwood. COVID-19 is a respiratory illness spreading through the droplets people produce when they talk, sneeze, and cough.[28]  The virus spreads "easily and sustainably through the community," especially when people are in close contact within one another (within about six feet).[29] Community spread of COVID-19 poses a serious global public health risk.  As of July 31, 2020, the Centers for Disease Control and Prevention reported a total of 4,405,932 cases of COVID-19 in the United States with 150,283 total deaths caused by the virus.[30]  People over age sixty-five and those of any age with serious underlying medical conditions including serious heart conditions and obesity are at an increased risk of severe illness from COVID-19.[31]  People with conditions such as moderate to severe asthma, hypertension, and damaged lung tissue may be at higher risk for severe illness from COVID-19.[32]  Correctional detention centers "present[] unique challenges" for controlling COVID-19 transmission among incarcerated individuals, staff, and visitors.[33]

4

While people on the street are able to engage in social distancing to avoid community spread, people in prison cannot follow the Center for Disease Control's guidelines to mitigate the spread of the virus and face a heightened risk of contagion.[34]

There are no inmate or staff positive cases at FCI-Allenwood, no inmate or staff deaths due to COVID-19, and one staff member recovered as of July 31, 2020,[35] but Mr. Hill suspects this low number is due to the prison's unsatisfactory testing.[36]

The United States opposes Mr. Hill's motions.[37] It argues Mr. Hill, at present, served approximately forty months of his sixty-five-month sentence of imprisonment, or 61.5% of his sentence. Assuming he earns all remaining good time credit and is released on October 27, 2021, Mr. Hill will have served 72% of his sentence. The United States notes two infractions: use of drugs/alcohol on February 3, 2019, and possession of an unauthorized item on August 7, 2019.[38]

Congress allows us to reduce a final sentence once an incarnated person exhausts his or her administrative remedies[39] only if we find (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under section 3553(a) warrant a reduction.[40]

### A. The United States concedes Mr. Hill presents "extraordinary and compelling reasons" for his release.

Mr. Hill argues his obesity, hypertension, high cholesterol, heart disease requiring a 2013 stent placement are extraordinary and compelling reasons to release him.[41] Mr. Hill alleges he cannot take steps to avoid infection at FCI-Allenwood because he lives in a cell, making social distancing impossible; showers in large groups with other incarcerated individuals; and uses community telephones and computers which are not disinfected between uses.[42]

5

The United States concedes he is obese with a BMI of 35.5, "identified by the CDC as a risk factor for severe outcome from COVID-19."[43] The United States contests Mr. Hill's diagnosis of heart disease, arguing he "does not in fact presently have heart disease."[44] This appears incorrect. The medical records show Mr. Hill has a history of coronary artery disease requiring stent placement in 2013. As noted above, at an April 27, 2020 prison health examination following Mr. Hill's complaints of chest pain, a physician's assistant noted a history of coronary artery disease. According to the CDC, "[c]oronary artery disease (CAD) is the most common type of heart disease in the United States. It is sometimes called coronary heart disease or ischemic heart disease."[45] According to the CDC, "[p]eople of any age with certain underlying medical conditions *are at increased risk* for severe illness from COVID-19": including obesity with a body mass index ("BMI") of 30 or higher and "serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies."[46] People with certain other conditions, including hypertension (high blood pressure) "*might be at an increased risk* for severe illness from COVID-19."[47] There is no dispute Mr. Hill has hypertension.

Congress provides a mechanism for us to modify Mr. Hill's sentence if "extraordinary and compelling reasons warrant such a reduction" as long as "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[48] Section 1B1.13 of the United States Sentencing Guidelines is the only applicable policy statement.[49] The policy statement provides we may only release Mr. Hill if we first find one of the following "extraordinary and compelling" circumstances:

(A) Medical Condition of the Defendant.-

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

6

> > Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> > (ii)    The defendant is—
>
> > > (I)    suffering from a serious physical or medical condition,
> > >
> > > (II)   suffering from a serious functional or cognitive impairment, or
> > >
> > > (III)  experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the defendant.—
>
> (C) Family Circumstances.
>
> (D) Other Reasons.—As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).[50]

The United States concedes Mr. Hill's obesity "presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19" and presents "'a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility,' as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. Here, the defendant's obesity, with a BMI in excess of 35, meets that test."[51]

Mr. Hill's *pro se* motion bases relief on his medical condition under subdivision (A).[52] His counseled motion bases relief on medical condition under subdivision (A) as well as the "catch-all" provision of subdivision (D).[53] Counsel argues Mr. Hill meets the "catch-all" "due to his cardiac issues."[54]

Because the United States concedes Mr. Hill meets the criteria of Medical Condition note, we need no further analysis. We also need not determine whether, under the catch-all Other

7

Reasons Note, Mr. Hill's other health conditions during the COVID-19 pandemic present an extraordinary and compelling reason.

> **B.    Mr. Hill is a danger to the community and release is not consistent with Congress's sentencing factors.**

Although Mr. Hill meets the extraordinary and compelling threshold as conceded by the United States, he fails to convince us he warrants a sentence reduction for other reasons Congress requires us to consider. Mr. Hill's release must be "consistent with any applicable policy statements issued by the Sentencing Commission."[55] The Commission's policy statement provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[56] Section 3142(g) instructs us to consider factors such as the nature and circumstances of Mr. Hill's crime; Mr. Hill's character, including his family ties, employment, and criminal history; and any danger posed to the community by his release. Mr. Hill claims he is not a danger to the community because his offense is nonviolent and because he participated in rehabilitation programs while incarcerated.[57] The United States argues Mr. Hill, "a notorious con man" is dangerous because, in addition to the crime he is currently serving time for, "he ha[s] a remarkable 39 previous convictions."[58] We agree with the United States.

We start with the nature and circumstances of Mr. Hill's crime. Mr. Hill pleaded guilty to one count of wire fraud for selling Canadian Gold Maple Leaf coins which he switched at the last minute for fake coins.[59] He engaged in the gold coin bait-and-switch scheme with at least seventeen victims in eleven different states over a period of over eight years.[60] He cheated his victims of $330,230 in total.[61] As the United States noted in its sentencing memorandum, Mr. Hill's "degree of deception was bold and personal because [he] had face to face interactions with

8

. . . vulnerable individuals, lied to them, and immediately took flight following his deceptive acts."[62]

We next address Mr. Hill's family ties and employment. Incarcerated persons seeking compassionate release may demonstrate a supportive family will help their reentry into the community.[63] If released, Mr. Hill plans to move home with his wife of eighteen years and their two children.[64] He does not allege how his family could reduce his likelihood of returning to crime.[65] Employment can also serve as a basis for compassionate release as it is "a good foundation for a life without criminal pursuits."[66] Mr. Hill advises us of two job offers, one to sell cars, the other to manage a dry cleaning business.[67] He participated in the Residential Drug Abuse Program during his time at FCI-Allenwood, another factor which could contribute to his leading a productive life upon release.[68]

But we must also consider Mr. Hill's extensive criminal history. At the time of his arrest, Mr. Hill had six active warrants in multiple states charging him with grand theft, larceny, selling property under false pretenses, and fraud.[69] He has thirty-nine previous convictions,[70] including assault, fraud, theft by deception, and unlawful possession of a firearm.[71] But "prior criminal history is not determinative in evaluating compassionate release."[72] And incarcerated individuals with nonviolent criminal histories are often eligible for release. In *United States v. Rodriguez*, for example, the court granted compassionate release in part because the defendant's "extensive criminal history [wa]s mostly composed of low-level drug dealing" and "[t]he predicate offenses to his mandatory minimum sentences were non-violent." [73] In *United States v. Bess*, the court released an incarcerated person with "an extensive criminal history . . . comprised of relatively small burglary and theft-related offenses resulting largely from untreated substance abuse."[74]

9

Like the defendant in *Bess*, Mr. Hill's crimes may possibly be related to his substance abuse problems: his counsel explains he "engaged in introspection which allowed him to understand the triggers and connection between his addiction and offense conduct."[75] Like the defendant in *Bess*, Mr. Hill has undergone treatment for his drug addiction while in prison. But on February 3, 2019, Mr. Hill committed a disciplinary infraction for use of drugs or alcohol.[76] He committed another infraction on August 7, 2019—possession of an unauthorized item.[77] These recent infractions suggest Mr. Hill is having difficulty with rehabilitation. And, though many of his earlier convictions were nonviolent, it is more than enough to weigh against release.

We turn last to whether Mr. Hill poses a danger to others or the community. Although perpetrators of wire fraud likely do "not present direct, physical danger to members of the community in the event of release,"[78] "danger may, at least in some cases, encompass pecuniary or economic harm."[79] Courts have gone both ways since the COVID-19 pandemic began deciding whether to grant compassionate release to individuals incarcerated for wire fraud.

In *United States v. Gileno*, the court released a man serving time for wire fraud finding the terms of his sentence imposing supervised release meant he would not be a danger.[80] In *United States v. Gonzalez*, the court granted compassionate release because "[t]he underlying criminal conduct was not a crime of violence, but rather white-collar fraud."[81] In *United States v. Rahim*, the court granted compassionate release to a man in prison for wire fraud and conspiracy to commit health care fraud.[82] The court found he would not pose a danger to the community and released him to home confinement.[83] In *United States v. Doshi*, similarly, the court released an individual serving time for health care fraud in part because:

> Medicare fraud is not a solitary crime but requires access to resources, accomplices, and, above all, trust. Doshi has lost all of that, and he demonstrated during his five years on bond the ability to distance himself from those criminal habits and networks. Further, Doshi's electronic communications and bank accounts can be

10

curtailed or monitored to prevent him from engaging in fraudulent activities while in home confinement as on supervised release.[84]

Multiple other courts have found perpetrators of wire fraud ineligible for compassionate release because they are a danger to the community.[85] In *United States v. Dawara*, the court declined to release a pretrial detainee due to COVID-19 because the court had probable cause to believe the detainee had, in addition to committing wire fraud, conspired to commit arson and use fire in a federal felony.[86] The nature and circumstances of the individual's offenses created a danger to others and "show[ed] his dangerousness."[87] In *United States v. Williams*, the court denied compassionate release to an individual incarcerated for wire fraud despite finding "arguably" extraordinary and compelling circumstances.[88] The court denied release under the 3553(a) factors but accepted the United States' argument the defendant's recent criminal history combined with the financial stresses of COVID-19 made him a continued risk to the community.

Mr. Hill's counsel argues part of Mr. Hill's sentence is a three-year term of supervised release and, even if we granted him compassionate release, he will remain under the supervision of the United States Probation Office pending the completion of the period of supervised release. Counsel argues this supervision will ensure the safety of the public and community at large. But supervision by a probation officer will not prevent Mr. Hill from employing computers and social media to further bait-and-switch schemes on any number of mobile computer devices. While we could monitor his home computer, we have little ability to monitor the use of portable and often easily disposable mobile devices through which Mr. Hill could renew his lucrative bait and switch schemes in several states.

On balance, we find Mr. Hill poses a danger to the community and to others. Though his gold coin scam is a nonviolent offense, Mr. Hill repeated the crime numerous times over several years and across multiple states. He will have the support of his family after release and has two

promising job offers. But, as the government points out, Mr. Hill would risk exposure to COVID-19 working as a car salesman or a laundromat manager.[89] As the court noted in *Doshi*, fraud "requires access to resources . . . and . . . trust."[90] But the *Doshi* court referred to healthcare fraud. Mr. Hill committed fraud by baiting coin collectors on Craigslist, which requires neither resources nor trust. Though Mr. Hill's sentence includes a three-year period of supervised release, this does not ensure the safety of the community. Mr. Hill most recently conducts his crimes through cyberspace.

### C. Releasing Mr. Hill is inconsistent with Congress's sentencing factors.

Even if found Mr. Hill today does not pose a danger to society, the last step of our inquiry requires us to consider whether Congress's sentencing factors under section 3553(a) warrant a reduction.[91] Our Court of Appeals instructs even though Mr. Hill's medical issues constitute extraordinary and compelling circumstances in light of COVID-19, we may deny compassionate release if he does not satisfy the applicable sentencing factors under section 3553(a).[92] The 3553(a) factors closely resemble those of section 3142(g).[93] They include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.][94]

Because we have thoroughly discussed the nature and circumstance of Mr. Hill's crime, his criminal history and personal characteristics, we start by evaluating the need for the sentence imposed. One court recently denied compassionate release under section 3553(a) to a person incarcerated for nonviolent crimes including wire fraud, securities fraud, and conspiracy because he had served less than two years of his twenty-two-year sentence.[95] Given the defendant's incarceration for fraud resulting in a $54 million loss, the court found an early release did not reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, or protect the public from his potential further crimes.[96] We acknowledge this defendant's crimes were more serious than Mr. Hill's, but comparatively speaking, the defendant stole $54 million from "hundreds of victims,"[97] whereas Mr. Hill took $330,230 from seventeen victims.[98] Another court denied release to an individual serving twenty-one months for bank fraud and conspiracy to commit wire fraud, finding despite his lack of criminal history, his nonviolent crime "had an enormous negative effect on both the individuals who trusted him and the community at large."[99] Mr. Hill cheated his victims of amounts ranging from $5,000 to $26,400.[100] His fraud undoubtedly had a tremendous financial impact upon each of them.

Another court found the section 3553(a) factors weighed in favor of release because the defendant, incarcerated for wire fraud, did not have a criminal history; had an elderly father in need of care; had two young children who needed him for support; and had served over half of his sentence with no disciplinary issues.[101] Mr. Hill has thirty-nine previous convictions; does not allege a family member needs his care; has one biological child who lives with Mrs. Hill; and has served more than half of his sentence but received two disciplinary infractions in the last year and a half.

13

We also consider the need to provide Mr. Hill with needed educational or vocational training, medical care, or other correctional treatment. Mr. Hill argues we should release him because his sentence requires him to seek mental health and substance abuse treatment while on supervised release.[102] He claims remaining incarcerated will deprive him of the opportunities to seek treatment because the Bureau of Prisons has halted all programming during the COVID-19 pandemic.[103] We sympathize with Mr. Hill, but this is not enough to grant his release. A court in our Circuit denied compassionate release two weeks ago to an incarcerated person who, like Mr. Hill, moved for compassionate release in part because COVID-19 rendered drug rehabilitation services unavailable to him.[104] The court acknowledged the defendant's effort to rehabilitate himself but found the possibility of being unable to participate in substance abuse programs insufficient to overcome the high standard of extraordinary and compelling circumstances.[105] We likewise find the temporary closure of programs at FCI-Allenwood is not enough to overcome the danger Mr. Hill poses to the community.

Releasing Mr. Hill with fourteen months left on his sentence will not promote respect for the law, afford adequate deterrence to criminal conduct, or protect the public from his crimes. Mr. Hill's wish to participate in drug substance programs is admirable but does not prevail here. We find releasing Mr. Hill inconsistent with the 3553(a) factors.

## III. Conclusion

The offense in this conviction stems from a "bait-and-switch" scheme employed by Mr. Hill to swindle his victims. Although the United States concedes Mr. Hill has shown extraordinary and compelling reason for his release, Mr. Hill is a danger to the community and releasing him is inconsistent with Congress's sentencing policy. We deny Mr. Hill's motion for compassionate release.

---

[1] We review the record in the ECF document system and Mr. Hill's Presentence Investigation Report ("PSR").

[2] ECF Doc. No. 40 at 3; PSR at ¶¶ 110-112.

[3] PSR at ¶ 32.

[4] *Id.* at ¶¶ 33-72.

[5] *Id.* at ¶ 116.

[6] *Id.* at ¶¶ 123-125.

[7] ECF Doc. No. 64 at 4, 16.

[8] ECF Doc. No. 64 at 20.

[9] ECF Doc. No. 34.

[10] PSR at ¶ 10.

[11] *Id.* at ¶ 11.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at ¶¶ 12-14.

[16] ECF Doc. No. 42.

[17] ECF Doc. No. 34.

[18] ECF Doc. No. 42.

[19] ECF Doc No. 66 at 3.

[20] ECF Doc. No. 64 at 4.

[21] *Id.*

[22] *Id.* at 5.

[23] *Id.* at 46-47.

[24] ECF Doc. No. 67 at 3.

[25] ECF Doc. No. 61 at 9.

[26] *Id.*

[27] *Id.*

[28] Centers for Disease Control and Prevention, *Coronavirus 2019 Basics*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019ncov%2Fprepare%2Ffaq.html#Coronavirus-Disease-2019-Basics (last visited July 31, 2020).

[29] *Id.*

[30] Centers for Disease Control and Prevention, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 31, 2020).

[31] Centers for Disease Control and Prevention, *People who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited July 31, 2020).

[32] *Id.*

[33] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 31, 2020).

[34] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007) (noting "[t]he probability of transmission of potentially pathogenic organisms [in prisons] is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

[35] Federal Bureau of Prisons, *COVID-19 Coronavirus,* https://www.bop.gov/coronavirus/ (last visited July 31, 2020).

[36] ECF Doc No. 61 at 10.

[37] ECF Doc. No. 67.

[38] *Id.* at 3.

16

[39] We earlier denied Mr. Hill's earlier motion for compassionate release finding he had not exhausted his administrative remedies. ECF Doc No. 57. at 7. More than thirty days have passed since Mr. Hill requested compassionate release from the warden of FCI-Allenwood. *Id.* He has sufficiently exhausted his administrative remedies.

[40] 18 U.S.C § 3852(c)(1)(A)(i).

[41] ECF Doc No. 61 at 3; ECF Doc No. 66 at 13.

[42] ECF Doc No. 61 at 7.
[43] ECF Doc. No. 67 at 4.

[44] *Id.*

[45] Centers for Disease Control and Prevention, *Coronary Artery Disease,* https://www.cdc.gov/heartdisease/coronary_ad.htm (last visited July 31, 2020).

[46] Centers for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated July 30, 2020).

[47] *Id.*

[48] 18 U.S.C. § 3582; as amended in First Step Act, 18 U.S.C. § 3582(c)(1)(A).

[49] U.S.S.G. § 1B1.13.

[50] *Id.*

[51] ECF Doc. No. 67 at 13-14.

[52] ECF Doc. No. 61.

[53] ECF Doc. No. 66 at 11-14.

[54] *Id.* at 54.

[55] 18 U.S.C. § 3582.

[56] U.S.S.G. § 1B1.13(2).

[57] ECF Doc No. 66 at 14-15.

[58] ECF Doc No. 67 at 15.

[59] ECF Docs No. 11, 34, 42.

---

[60] ECF Doc No. 34 at ¶¶ 1, 6.

[61] *Id.*

[62] ECF Doc No. 38 at 4.

[63] *United States v. Loyd*, No. 15-20394-1, 2020 WL 2572275, at *4–5 (E.D. Mich. May 21, 2020); *United States v. Schafer*, No. 18-6152, 2020 WL 2519726, at *7 (W.D.N.Y. May 18, 2020).

[64] ECF Doc No. 61 at 9; ECF Doc No. 66 at 15.

[65] *Cf. Loyd*, 2020 WL 2572275, at *4 (granting compassionate release to "a dedicated father who has taken responsibility for his past wrongs and is eager to come home and positively impact all of those who look up to him").

[66] *United States v. Salvagno*, No. 02-51, 2020 WL 3410601, at *6 (N.D.N.Y. Apr. 23, 2020), *reconsideration denied* (June 22, 2020); *United States v. Parker*, No. 98-00749-1, 2020 WL 2572525, at *12 (C.D. Cal. May 21, 2020) (granting compassionate release to an individual who "aver[ed] that he ha[d] been offered employment at his family's private investigation and commercial real estate businesses").

[67] ECF Doc No. 61 at 9; ECF Doc No. 66 at 15 ("Both job offers have been confirmed by counsel and would be available to Mr. Hill upon release thereby facilitating his successful transition to supervision.").

[68] ECF Doc No. 66 at 15-16.

[69] ECF Doc No. 1 at ¶ 8.

[70] ECF Doc No. 67 at 15.

[71] *Id.*

[72] *United States v. Romero*, No. 13-01649-4, 2020 WL 364275, at *2 (W.D. Tex. Jan. 21, 2020).

[73] *United States v. Rodriguez*, No. 03-00271-1, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020).

[74] *United States v. Bess*, No. 16-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22, 2020) (discussing an individual who completed one drug program while incarcerated and almost completed a second).

[75] ECF Doc No. 66 at 15.

[76] ECF Doc No. 67 at 3.

[77] *Id.*

[78] *United States v. Cochran*, No. 06-114, 2020 WL 2092836, at *6 (N.D. Ind. May 1, 2020).

[79] *United States v. Giampa*, 904 F. Supp. 235, 358 (D.N.J. 1995) (quoting *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir.1992)).

[80] *United States v. Gileno*, No. 19-161-1, 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020).

[81] *United States v. Gonzalez*, No. 18-232-15, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020).
[82] *United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *4 (E.D. Mich. May 21, 2020).

[83] *Id.*

[84] *United States v. Doshi*, No. 13-20349, 2020 WL 2556794, at *3 (E.D. Mich. May 20, 2020).

[85] *See, e.g., United States v. Willis*, 382 F. Supp. 3d 1185, 1188–89 (D.N.M. 2019) (denying compassionate release to a wheelchair-bound defendant who needed medical care around the clock and was only expected to live eighteen months, given severity of wire fraud).

[86] *United States v. Dawara*, No. 19-414-1, 2020 WL 2404898, at *4 (E.D. Pa. May 12, 2020).

[87] *Id.*

[88] *United States v. Williams*, No. 18-483, 2020 WL 3577411, at *5 (D. Md. July 1, 2020).

[89] ECF Doc No. 67 at 15. *See Williams*, 2020 WL 3577411, at *6 ("Despite relying on the combination of medical conditions that arguably make him more vulnerable to serious complications should he contract COVID-19, Mr. Williams proposes that he be permitted to return to the community and work in a profession that would bring him into frequent contact with members of the public, *i.e.,* as a car salesman. Either the medical conditions are serious enough to justify isolation from possible infection, or they are not.").

[90] *Doshi*, 2020 WL 2556794, at *3.

[91] 18 U.S.C § 3852(c)(1)(A)(i).

[92] *United States v. Pawlowski*, No. 20-2033 (3d. Cir. Jul. 24, 2020).

[93] *Salvagno*, 2020 WL 3410601, at *7 ("The factors listed in 3142(g) are largely duplicative of those in 3553(a).").

[94] 18 U.S.C. § 3553(a).

[95] *United States v. Wragg*, No. 15-398, 2020 WL 4015204, at *10 (E.D. Pa. July 16, 2020).

19

[96] *Id.*

[97] *Id.*

[98] ECF Doc No. 38 at 4.

[99] *United States v. Bayfield*, No. 14-356, 2020 WL 2615937, at *1, 3 (E.D.N.Y. May 21, 2020).

[100] ECF Doc No. 42 at 6-7.

[101] *United States v. Rivernider*, No. 10-222, 2020 WL 2393959, at *1 (D. Conn. May 12, 2020).

[102] ECF Doc No. 61 at 9.

[103] *Id.*

[104] *United States v. Gore*, No. 10-250, 2020 WL 3962269, at *6 (D.N.J. July 13, 2020).

[105] *Id.*